TUCKER, Judge.
This is a suit by Dixie Electric Membership Corporation, a Louisiana non-profit membership corporation, organized under Louisiana Revised Statutes 12:401-430, and engaged in the business of transmitting and distributing electricity for power, lighting, heating, or other such uses, in a number of parishes in the State of Louisiana. Plaintiff Dixie Electric sought to expropriate a hundred foot right-of-way in the northern portion of Livingston Parish for the purpose of a 69KV transmission and distribution servitude to give better service in the Watson to Holden, Louisiana, area.
A description of the proposed installation taken from the testimony of Mr. *339 Floyd Barbay, the consulting electrical engineer who designed the transmission line in question, is given below:
The section of the 69KV transmission line running across the property to be expropriated consists of a single pole type of construction with two crossarms at the top. The basic pole is sixty feet tall. It is southern yellow pine, creosoted. The typical pole has a crossarm at the top which is eight feet long, and which is placed 3.5 feet from the top of the pole. There is a six foot space beneath it, between it and the next cross-arm which is ten feet long. There is a string of four bells which extends along the crossarms to hold three conductors. The wire is about forty feet above the ground, and the poles are about three hundred feet apart. The pole being sixty feet tall and about sixteen inches in diameter at ground level, is buried eight feet in the ground, with the result that it extends about fifty-two feet into the air. There is one conductor on the tip-top of the pole, which is known as the static. The construction of the wire at this point is three-eighths of an inch in diameter, made of high strength steel. Its primary purpose is to drain off any static charges or lightening charges which might hit the line. This line protects the three conductors which are located beneath it, one conductor on the top cross arm, and two conductors on the bottom crossarm. The wires that carry the “hot electricity,” the phase conductors, are 336-400 MCM aluminum, known as 86 SR. They have twenty-six strands of aluminum and seven strands of steel. The minimum clearance of this line is twenty-seven feet, although the code calls for only twenty-one feet in an area accessible to pedestrians.
The suits brought by Dixie Electric to expropriate the surface needed for its servitude were consolidated for trial, and judgment was given for Dixie Electric granting the right of servitude and awarding judgments in favor of the several defendants, in varying amounts, for the surface rights expropriated and for severance damage caused to the remainder. Ten of these defendants have appealed or answered the appeal taken against them by Dixie Electric. The right to expropriate by Dixie Electric was not questioned on appeal. The sole question in each appeal centers around the amount of'the award made for the surface rights taken and for various and sundry items of damage.
In the instant case judgment was awarded by the trial court in favor of plaintiff Dixie Electric giving it a 100' servitude across defendants’ property, which was a 18.60 acre tract, with 0.78 acres being expropriated for the right-of-way, more properly described as follows:
“A certain tract or parcel of ground situated in the NW ,J4 of SE ySection 32, T-5-S, R-4-E, Livingston Parish, Louisiana, and being more particularly described as follows: Commence at the southeast corner of Section 32, T-5-S, R-4-E, thence west 25.07 chains to west side of State Highway 449; thence N 8° 30' E along same 32.99 chains to a point, said point being the northeast corner of property of Mrs. Lillie McLin Caraway, et al; thence S 89° 50' W along the north property line of Mrs. Lillie McLin Carraway, et al, a distance of 199.5 feet to a point, and the Point of Beginning; thence continue S 89° 50' W along the north property line of Mrs. Lillie McLin Caraway, et al, a distance of 272.85 feet to a point; thence S 68° 26' E a distance of 479.49 feet to a point on the east property line of Mrs. Lillie McLin Caraway, et al, said point being on the west side of State Highway 449; thence N 8° 30' E along same and along the east property line of Mrs. Lillie McLin Caraway, et al, a distance of 102.63 feet to a point; thence N 68° 26' W a distance of 202.53 feet to Point of Beginning, containing 0.78 acres more or less.”
The trial court awarded defendants Mrs. Lillie McLin Caraway, Stanley H. McLin, *340 Jr., and Althea McLin Hall, the sum of $585.00 as just compensation for the servitude expropriated, and an additional sum of $500.00 as severance damages. He fixed the expert witness fee of Earl R. Graham at $350.00 and taxed it as costs of court to be paid by plaintiff.
Plaintiff Dixie Electric has appealed from this judgment alleging error by the trial court in awarding a sum for the land expropriated based on an evaluation of the land at $750.00 per acre; in awarding the full fee value of the land taken; and in awarding severance damages. Defendants have answered the appeal, asking an increase in judgment.
No oral or written reasons for judgment were given by the trial judge. Simple arithmetic indicates, however that $750.00 per acre, borne out by the supplemental per curiam of the trial court, was basis for the award made in this suit as in eight of the Dixie Electric suits consolidated for trial. We are at a loss as to how the trial judge arrived at this basis for valuation in view of the fact that Mr. Graham, expert witness for nine of the defendants in these consolidated cases, appraised the land at trial for $1,000.00 per acre, while Dixie Electric’s appraiser James C. Carpenter, appraised it at $620.00 per acre. Averaging estimates of expert witnesses, or drawing a mean between or among them has never been considered a sound basis for judgment in the expropriation suits of this state. We can find no reasonable basis in the record for the trial judge’s evaluation per acre of the land expropriated.
We remain unconvinced by the defendant’s expert witness, Earl R. Graham, who was employed by the defendant a few days before the trial began and gave defendant’s property only a cursory examination. His testimony is not grounded in reason, and is entitled to little, if any, probative weight. Our inability to rely upon the findings of Mr. Graham as an expert witness has been well expressed by us in three other cases this day decided; Dixie Electric Membership Corp. v. Kinchen, La.App., 280 So.2d 332; Dixie Electric Membership Corp. v. Kinchen, et al., La.App., 280 So.2d 342; and Dixie Electric Membership Corp. v. Whitehead, La.App., 280 So.2d 315. Our confidence in Mr. Graham as an expert witness was further shaken by his testimony in the Sibley case this day decided, La.App., 280 So.2d 346, in which he stated unequivocally, when asked if he were competent to appraise property, “No, I am not,” and was accepted by the trial court as an expert witness over the objection of plaintiff’s counsel. The testimony in that case was adopted by stipulation in this case.
The comparables used by Mr. Graham in the Shell Sibley case and in the Stanley McLin case are the same ones used in this case. The three Rice sales which Mr. Graham used in the Shell Sibley and Stanley McLin cases, are equally objectionable as comparables in this case for the reason that they are sales of subdivision property with all utilities, only one mile north of Walker, Louisiana. The property in this case is a rectangular-shaped piece of property seven miles north of Walker, Louisiana, more fully described below.
The best testimony that we have in this case is that of Dixie Electric’s appraiser, James C. Carpenter, who described the subject property as follows:
“Subject land, as told in the Site Data Sheet, is a tract of land containing approximately 18.6 acres is rectangular in shape and lying on the West side of the Corban North Road. Owners hereon have a large frame home located on the middle front about 200 feet from the road with small outbuilding. This land is all fenced with mostly pasturage and the Northern side covered with trees' of no monetary value. The proposed servi *341 tude is intended to cut across the Northeastern corner, Northwest to Southeast and cross the road at a point 124 feet South of the Northeast corner. This appraiser feels by installation of this servitude would clear more of this area for pasturage and enhance ownership further, therefore offsetting any damages that may arise.”
Mr. Carpenter found the best use of this property to be rural residential and listed three comparable sales of other rural residential sites similarly situated, and ranging in price from $500.00 per acre to $1,100.00 per acre. After making the necessary adjustments Mr. Carpenter found defendants’ property to be worth $620.00 per acre for the 0.78 acres taken, or- $483.60. He assigned 80% of value and rounded it off at $378.00 for the land servitude expropriated There is a minus error in this calculation and the value fixed should be $387.00, which, in our opinion, represents the true value of the servitude expropriated.
We agree with Mr. Carpenter in assigning 80% of value for the reasons that he has stated in his appraisal to the effect that he believes the landowners not only have retained substantial surface rights in the property, but also have actually gained an enhanced usage of the property. For these and the additional reasons that the servitude cuts across only an extreme northeastern tip of the property, not interfering with defendants’ usage of the remainder, we will reverse the decision of the trial court in awarding severance damages. Defendants have utterly failed to sustain their burden of proving actual damage to their property, and of proving the value of their property before and after the taking, all as required by the jurisprudence. See Michigan Wisconsin Pipeline Co. v. Fruge, 227 So.2d 606, 610 (La. App. 3d Cir. 1969), writ refused, 255 La. 149, 229 So.2d 732 (1970).
We allude to our relatively detailed discussion of the problems entailed and the methods employed in fixing expert witness fees, which is contained in the opinion of the consolidated case of Dixie Electric Membership Corporation v. McDowell, La.App., 280 So.2d 306, handed down this day.
In the instant case the services of Earl R. Graham as an appraiser were engaged by the defendants some time prior to trial date. It appears that Mr. Graham’s preparatory work and examination were relatively meager in scope and extent. His statement for services gives no itemization of the hours consumed and his output of effort in reaching his conclusions. It is clear that he did not examine the records in the courthouse to find his comparables. Under the circumstances here we believe Mr. Graham is entitled to a fee of $100.00 for his preparatory appraisal work and a fee of $50.00 for his appearance in court as an expert witness, and that the total sum of $150.00 should be taxed as costs.
For the reasons assigned the judgment of the trial court awarding compensation for the true value of the land taken for the servitude will be amended by reducing this sum from $585.00 to the sum of $387.00; the award by the trial court of severance damages of $500.00 is reversed; the expert witness fee of Earl R. Graham is reduced from the sum of $350.00 to the sum of $150.00; in all other respects the judgment is affirmed.
The defendants are cast with the costs of this appeal; the costs of the trial court are to be borne by the plaintiff.
Judgment affirmed, as amended, in part; reversed in part; and rendered.